## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**APRIL CARROLL LESTER,**

      **Plaintiff,**

**v.**                                           **Case No.: 2:17-cv-04376**

**NANCY A. BERRYHILL,**
**Acting Commissioner of**
**Social Security,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 13, 14).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF

No. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.    <u>Procedural History</u>

On August 13, 2014, Plaintiff April Carroll Lester ("Claimant") protectively filed an application for DIB, alleging a disability onset date of December 5, 2013, due to suicidal tendencies, diabetes, anxiety, depression, restless leg syndrome, bipolar disorder, sleep apnea, glaucoma, high heart rate, and chronic constipation. (Tr. at 70-71, 183). The Social Security Administration ("SSA") denied Claimant's application initially on October 2, 2014 and upon reconsideration on February 2, 2015. (Tr. at 103, 115). Claimant subsequently filed a request for an administrative hearing. (Tr. at 122). The hearing was held on October 31, 2016, before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 39-68). By written decision dated November 17, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 21-33). The ALJ's decision became the final decision of the Commissioner on September 21, 2017 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 13), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 14), to which Claimant filed a reply. (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 40 years old on her alleged disability onset date and will be 45 years old on her date last insured, December 31, 2018. (Tr. at 21, 183). She communicates in English, has a high school diploma, and has vocational training as a Certified Nursing Assistant and Emergency Medical Technician ("EMT"). (Tr. at 200, 202-203). Claimant's past relevant work includes jobs as a telemarketer and insurance agent. (Tr. at 203). At the administrative hearing, Claimant testified that she also worked in the past as a secretary for the Boone County Development Authority, a medical assistant, a security guard, an EMT, and as a clerk for Eagle Creek Mining Company. (Tr. at 47-49).

## III.    Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

3

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ

documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 23, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that, despite some employment at a pizza shop during the second and third quarters of 2014, Claimant had not engaged in substantial gainful activity since December 5, 2013, her alleged disability onset date. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "obesity, sleep apnea, diabetes mellitus, chronic kidney disease, status-post left rotator cuff repair, degenerative disc disease of the lumbar and thoracic spine, bipolar disorder, and generalized anxiety disorder." (Tr.

at 23-24, Finding No. 3). The ALJ also considered Claimant's gastroesophageal reflux disease ("GERD"), hiatal hernia repair, controlled hypertension, atypical chest pain, ocular hypertension, and amblyopia, but determined that these impairments were non-severe. (Tr. at 23-24, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 24-27, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except can never perform climbing of ladders, ropes, or scaffolds; can occasionally perform climbing of ramps and stairs, balancing, kneeling, stooping, crouching, and crawling; must avoid concentrated exposure to hazards such as heights and machinery; is limited to understanding, remembering, and carrying out simple instructions; to performing routine and repetitive tasks; could not work at a rapid pace or requiring strict production quotas; to occasional interaction with co-workers and supervisors and to no interaction with the public.

(Tr. at 27-32, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work (Tr. at 32, Finding No. 6).

Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education, in combination with her RFC, to determine her ability to engage in substantial gainful activity. (Tr. at 32-33, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the date last insured (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 32, Finding Nos. 7-9). Given these factors and Claimant's RFC, and with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 32-33, Finding No. 10). The ALJ determined that Claimant could perform the requirements of unskilled

light exertional level occupations such as price marker, stocker, or hand packer; alternatively, Claimant could find employment in unskilled sedentary occupations such as grader/sorter, assembler, or table worker. (*Id*). Accordingly, the ALJ found that Claimant was not disabled under the Social Security Act. (Tr. at 33, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision. First, she alleges that the ALJ's finding that she did not meet the criteria of Listing 12.04C(2) was not supported by substantial evidence. (ECF No. 13 at 6, 15). Claimant argues that in making that finding, the ALJ relied on cursory opinions by non-examining State agency consultants, despite the ALJ's explicit acknowledgement that these opinions failed to accurately reflect Claimant's limitations. (*Id.* at 15-16). She adds that the ALJ disregarded the opinion and treatment evidence provided by Ms. Florence Collier, Claimant's treating therapist, without adequately explaining his reasoning for rejecting relevant evidence and for reaching his conclusions. Claimant contends that the ALJ, in effect, improperly substituted his own opinions for that of a trained professional. (*Id.* at 18-19).

In her second challenge, Claimant alleges that the ALJ failed to follow Social Security regulations and rulings in dismissing the opinion of a licensed practical counselor, Ms. Collier. (*Id.* at 8). Claimant takes issue with the ALJ's treatment of an October 28, 2016 mental assessment completed by Ms. Collier, which indicated that Claimant had "marked" limitations in a number of categories that would substantially affect her ability to work. (*Id.* at 10; Tr. at 1325-1326). Claimant contends that the ALJ disregarded this opinion, despite the lack of any competing opinions upon which to rely, and without providing a reasonable explanation based upon the evidence of record. (*Id.* at 10-11).

In response, the Commissioner contends that the ALJ was entitled to disregard Ms. Collier's opinion as she was not an acceptable medical source, and the ALJ sufficiently explained how Ms. Collier's opinion was not supported by the record. (ECF No. 14 at 8). According to the Commissioner, the ALJ had previously indicated he was crediting the opinion of the State agency evaluators on the issue of Claimant's degree of limitation, so he was not substituting his own judgment for that of a medical professional. Moreover, during the course of his 12.04C analysis, the ALJ engaged in an extended discussion of Claimant's activities that conflicted with Ms. Collier's opinion. (ECF No. 14 at 10-11). As to Claimant's contention that the ALJ's 12.04C finding was not supported by substantial evidence, the Commissioner first argues that Ms. Collier's opinion was not on point as it dealt with paragraph "B" criteria, not the paragraph "C" criteria at issue, and, as above, it was sufficiently disputed by the ALJ's canvass of the record. (*Id.* at 13-14). The Commissioner asserts that the ALJ engaged in an extensive discussion of conflicting evidence and maintains that Claimant is attempting to convince the Court to reweigh the evidence. (*Id.* at 14-15).

## V.    **Relevant Evidence**

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A.  *Medical Records*

On December 8, 2013, Claimant was admitted to Logan Regional Medical Center where she was treated for drug overdose following an attempted suicide. (Tr. at 321). Claimant reported taking an unknown amount of Prozac and Zoloft that had previously been prescribed to treat her depression. (*Id.*). She had not been taking these drugs regularly for over a year, and thus had an excess amount which she used in the suicide

attempt. (*Id.*). Later that day, she was transferred to the Charleston Area Medical Center ("CAMC") General Emergency Department where she was evaluated by physician Christopher Flanagan, DO. (*Id.*). Dr. Flanagan reported that Claimant had briefly left her husband and family to move to Virginia with a romantic partner. (Tr. at 321). Claimant stated that she had wanted to take her children with her and leave behind all the underlying emotional and marital turmoil she was experiencing, but they were unwilling to move. (*Id.*). She reported feeling "trapped" in West Virginia with her husband's family as she had no friends or family of her own there. (*Id.*). She had recently returned to West Virginia and told her husband about the affair, stating she wanted to fix the marriage. (*Id.*). However, that morning, while her husband was out of the house, Claimant took an unknown quantity of Prozac and Zoloft in an attempt to "end it all," because she felt she could not deal with the stress of her circumstances anymore. (*Id.*). Dr. Flanagan noted that Claimant had "an underlying history of depression and emotional conflicts," which may have been a consequence of childhood abuse she experienced. (*Id.*). He related that Claimant was crying as she explained her attempted suicide and stated she "never wanted to hurt anyone," she just wanted some relief. (Tr. at 322). Dr. Flanagan reported that Claimant denied any present suicidal ideation, despite her attempt that day, assessed her condition as stable, and medically cleared her for a Behavioral Medicine Evaluation. (Tr. at 323).

The following day, Claimant and her husband appeared at the Prestera Centers For Mental Health ("Prestera") for a mental health assessment performed by licensed professional counselor, Florence Collier. (Tr. at 686). Claimant related that the suicide attempt was precipitated by her husband's discovery of the affair and underlying emotional turmoil. (Tr. at 686-87). Claimant and her husband had been having marital

conflicts for several years; Claimant revealed that recently her husband's brother had been sexually harassing her and exposing himself to her without any intervention by her husband. (Tr. at 687). She stated that this type of harassment triggered negative emotional memories from her past. (Tr. at 687). Claimant noted she had quit her insurance job last week, which she now regretted, and she was looking for a new job. (*Id.*). Ms. Collier stated Claimant was attempting to get back on track after the suicide attempt and worsening depression; she was referred for further counseling and a psychiatric evaluation to determine if she would benefit from psychotropic medication. (*Id.*). Ms. Collier assessed Claimant's appearance as normal. She was appropriately oriented to person, place, situation, and time. (Tr. at 687-88). However, her affect was flat; her sociability was inhibited; her thought content was not coherent; and her speech was marred by stuttering. (Tr. at 688-89). Ms. Collier assessed Claimant's Global Assessment of Functioning Scale ("GAF") score as 55.[1] (Tr. at 690).

On a subsequent December 13, 2013 visit, Ms. Collier noted that Claimant had been having a "harsh time with the latest manic episode." (Tr. at 357). Claimant reported that her earlier overdose was an attempt to "stop the noise." (*Id.*). Ms. Collier stated that Claimant displayed a history of manic and erratic behavior in her marriage (*Id.*). She believed Claimant had "been running amuck [sic] for about 2-3 months" without her medications and needed to begin taking them again as "she is much better in family

---

[1] The Global Assessment of Functioning Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." Diagnostic Statistical Manual of Mental Disorders ("DSM"), Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

matters and job when on stable med regime." (*Id.*). Claimant returned for two more sessions with Ms. Collier on December 18 and 20, 2013. (Tr. at 358-59). She reported taking her medications to "no avail." (Tr. at 358). Ms. Collier stated that Claimant agreed she needed to return to a stable medication regimen, and they worked on strategies to cope with Claimant's mental health and marital issues. (Tr. at 358-59). Ms. Collier described Claimant as having "magical thinking about how life works." (Tr. at 359).

On December 27, 2013, Claimant was admitted to the Crisis Residential Unit ("CRU") at the Boone County Prestera after she again began to feel suicidal. (Tr. at 716). At intake, Claimant was assessed by Terri Bryan, RN, and Ardith Michaux, MSW, to determine her need for crisis stabilization services. (Tr. at 691-95). Claimant reported worsening depression and panic attacks when around people, resulting in difficulty breathing, heart palpitations, and nausea. (Tr. at 691). Claimant was not on any medication for her psychiatric issues, but reported taking Prozac and Trazodone in the past and seeing some beneficial results. (*Id.*). Claimant was given a Mental Status Examination ("MSE") with issues noted in sociability, speech, coping ability, eye contact, motor activity, sleep, and suicidal thoughts. (Tr. at 693-94). She was assessed with Major Depressive Disorder; Panic Disorder Without Agoraphobia; Personality Disorder, NOS; and had a GAF score of 50.[2] (Tr. at 694-95). Ms. Bryan and Ms. Michaux recommended immediate admission to the CRU for crisis stabilization services. (Tr. at 692). Later the same day after admission to the CRU, Claimant received two subsequent GAF scores of 50. (Tr. at 723, 657).

---

[2] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

On December 28, 2013, Claimant presented to Victor Nease, MD, for a psychiatric evaluation. (Tr. at 447). Her MSE results were mainly normal, except for a depressed mood and a constricted and dysphoric affect. (Tr. at 447-48). Dr. Nease diagnosed Claimant with Major Depressive Disorder and Personality Disorder, NOS. He gave her a GAF score of 55. (Tr. at 449). Dr. Nease prescribed Effexor XR for depression and anxiety and Trazodone for sleep. (Tr. at 450). On the following day, Dr. Nease noted in a medication management plan that Claimant was unable to start Effexor due to its unavailability. (Tr. at 560). He assessed her MSE and GAF score as unchanged. (Tr. at 560-62).

On December 30, 2013, Claimant was evaluated by Melissa Moody, MD, for a medical management plan. (Tr. at 564). Claimant reported to Dr. Moody that she had experienced manic type symptoms for many years; she frequently had periods of excessive energy with increased impulsivity and rapid thoughts. (*Id.*). She stated that these periods generally occurred two times a month and would last 3-4 days. (*Id.*). Claimant indicated that she had been experiencing increased depression due to ongoing relationship problems, but denied present suicidal ideation. (*Id.*). Claimant's MSE was again largely normal, except for depressed mood and constricted and dysphoric affect. (Tr. at 564-65). Dr. Moody diagnosed Claimant with Bipolar II Disorder and Personality Disorder, NOS; she was given a GAF score of 55. (Tr. at 565-66). Dr. Moody discontinued Effexor, which Claimant had never actually received, continued the Trazodone prescription, and started a prescription of Lithium. (Tr. at 567). The next day, Claimant was again assessed by Dr. Moody. (Tr. at 569). Dr. Moody discussed with Claimant why her returning home immediately was not appropriate considering that she had only started her medications the prior day. (Tr. at 569). Dr. Moody noted that Claimant had

12

incorrectly been stating she had not received her prescribed dosages. (*Id.*). Claimant's MSE, disorders, and GAF score were unchanged except that her mood was "better." (Tr. at 569-571). Dr. Moody continued the Lithium prescription, increased the Trazodone dosage, and indicated that Claimant would follow up with Doctor Thornton after discharge. (Tr. at 572). Claimant received similar assessments on January 1 and 2, 2014. (Tr. at 574-81). She was discharged from the CRU on January 2, 2014. (Tr. at 716).

On January 10, 2014, Claimant reported for a therapy session with Ms. Collier. (Tr. at 696). Claimant believed she was benefitting from her medications and the CRU stay. (*Id.*). Ms. Collier stated that Claimant was much more stable, but was still struggling with daily sadness and sporadic bouts of crying. (*Id.*). Claimant continued to have interpersonal conflict with her husband and family members. (Tr. at 696-97). She identified her brother as one of the people who abused her as a child. His continuing presence in the local area contributed to Claimant's stress. (Tr. at 697). In the MSE, Ms. Collier found Claimant's sociability to be inhibited, her affect labile, and her thought content to be a "flight of ideas," with abnormal results noted for speech, coping ability, motor activity, eye contact, sleep, and appetite. (Tr. at 697-99). Claimant received a GAF score of 55. (Tr. at 700). Claimant returned to Ms. Collier's office on January 14, 2014, where she reported continuing family relationship issues. (Tr. at 360). Ms. Collier noted that Claimant had "little insight into the behavioral challenges she is facing" and that "[w]ork is questionable on the cognitive end." (*Id.*). Ms. Collier noted improvements in Claimant's relationship with her husband in a subsequent January 22, 2014 visit.

On January 29, 2014, Claimant met with Ted Thornton, MD, for a psychiatric evaluation. (Tr. at 452). Dr. Thornton documented that he had previously had success treating Claimant with Prozac, Trazodone, and Klonopin. (*Id.*). Her MSE assessment was

mostly normal, except for a constricted and dysphoric affect and a depressed, irritable, and nervous mood. (Tr. at 452-53). Dr. Thornton diagnosed Claimant with Bipolar I Disorder-Mixed-Moderate; Personality Disorder, NOS; and Generalized Anxiety Disorder. He assigned Claimant a GAF score of 50. (Tr. at 454). Dr. Thornton discontinued Claimant's Lithium prescription due to its inefficacy and side effects, but continued her Trazodone and restarted Klonopin. (Tr. at 455).

Later that day, Claimant met with Ms. Collier for therapy. (Tr. at 362). Ms. Collier observed minor improvements in Claimant's relationship issues, but noted that she appeared slightly manic and made many poor decisions. (*Id.*). Claimant returned on February 12, 2014 and reported continuing familial disputes with her husband and his family, as well as issues with her son being sent to juvenile court. (Tr. at 363).

On February 26, 2014, Claimant appeared for a medication management session with Dr. Thornton and a therapy session with Ms. Collier. (Tr. at 364, 584). Dr. Thornton's MSE of Claimant was again mostly normal, except for her mood, which he recorded as "rapidly shifting" and nervous. (Tr. at 584-85). Claimant's diagnoses remained the same, and she received a GAF score of 50. (Tr. at 585-86). Claimant's medications remained the same other than the addition of Neurontin. (Tr. at 587). In her therapy session, Claimant reported instances of attempted self-harm, including a time she tried to cut herself with a dull knife, but was stopped by her husband. (Tr. at 364). She described further emotional conflict in her family with continuing fallout from the affair. (*Id.*). Ms. Collier noted that Claimant got "overstimulated" by social media and fell into a "mania storm" at times due to conflicts with family. (*Id.*). Claimant described slight improvement, but with further domestic disputes in her March 10, 2014 session with Ms. Collier. (Tr. at 365).

On March 26, 2014, Claimant had another medication management session with

Dr. Thornton. (Tr. at 588). Her MSE, diagnoses, and GAF score remained unchanged. (Tr. at 588-90). Dr. Thornton increased Claimant's Klonopin dosage, continued Trazodone, and discontinued Neurontin due to its lack of efficacy and side effects. (Tr. at 591). During a March 28, 2014 therapy session, Claimant reported increased family troubles. (Tr. at 366). At the next session, on April 2, 2014, Ms. Collier noted that Claimant was displaying rapid and pressured speech, a flight of ideas, and disconnected thoughts. Claimant was difficult to redirect. (Tr. at 367). She continued to make poor decisions and described ongoing familial conflicts. (*Id.*). However, Claimant said she was excited about a potential part-time job. (*Id.*).

On April 16, 2014, Dr. Thornton changed Claimant's medications due to reported mood swings. (Tr. at 595). He discontinued Trazodone and Klonopin, began Xanax, and started a trial dosage of Topomax. (*Id.*). Claimant's MSE, diagnoses, and GAF score were unchanged. (Tr. at 592-94). At her following therapy session, Claimant appeared in a "mixed mood state." (Tr. at 368). She continued to complain of marital discord and expressed understanding of the need to continue taking her medications. (*Id.*). On May 7, 2014, Ms. Collier described Claimant as "a bit manic," documenting that she was "having problems with flight of ideas." (Tr. at 369). Claimant reported multiple familial disputes. (*Id.*). She had briefly gotten a job, but promptly lost it. (*Id.*). Ms. Collier noted that Claimant was having a "rather difficult time keeping her daily life going." (*Id.*).

In a May 14, 2014 assessment, Dr. Thornton reported no change in Claimant's MSE, diagnoses, or GAF score. Dr. Thornton increased Claimant's Topamax and continued her Xanax. (Tr. at 596-99). During her June 3, 2014 therapy session, Claimant reported ongoing disputes with her husband over management of finances and time together. (Tr. at 370). On June 11, 2014, Dr. Thornton again increased Claimant's

Topomax dosage. Otherwise, her condition and treatment were unchanged. (Tr. at 600-603).

In June 17, 2014 treatment notes, Ms. Collier described Claimant as manic in verbiage and unable to maintain a seated position. (Tr. at 371). Claimant reported that she was taking her medications, but she could not stop fidgeting. (*Id.*). Her thoughts were very disconnected, and she could not slow down sufficiently to focus on a single thought. (*Id.*). Ms. Collier felt that Claimant was losing control mentally. (*Id.*). In the next session on June 27, 2014, Claimant again appeared manic and was having significant family troubles. (Tr. at 372). Ms. Collier suspected that Claimant was skipping or missing her medications, perhaps due to the fact that her husband was busy and less able to help her keep track of her doses. (*Id.*). On July 9, 2014, Dr. Thornton reported in the MSE that Claimant's mood was "better" and her diagnoses remained the same, but her GAF score increased to 55. (Tr. at 604-606). He changed only the dosage schedule of Claimant's Topamax prescription. (Tr. at 607).

Notwithstanding Dr. Thornton's belief that Claimant was doing better, she reported to Ms. Collier on July 11, 2014 that she was facing increased stress due to family dysfunction. (Tr. at 373). Ms. Collier documented worsening signs of anxiety, disorganized thinking, and poor decisions. (*Id.*). She noted that Claimant struggled to deal with the opinions of others and had trouble returning to stability after conflict. (*Id.*). The treatment plan was to find strategies to improve Claimant's functioning. (*Id.*). On July 23, 2014, Claimant displayed pressured speech, ruminations, and trouble focusing. (Tr. at 374). She was easily distracted and had little ability to concentrate. (*Id.*). She described feeling relatively stable some days, but hopeless on others. (*Id.*). Ms. Collier stated that Claimant "has little ability to work on the problems she has," and displays

16

"serious life-impacting bi-polar do'ed [sic] symptoms." (*Id.*). In an August 5, 2014 session, Claimant reported no significant changes. (Tr. at 375). She was continuing to struggle with a perceived lack of attention from her husband and difficulty managing her teenaged sons. (*Id.*). Ms. Collier noted that Claimant made poor eye contact, had difficulty staying on subject, and was nearly impossible to redirect. (*Id.*). Continuing relationship difficulties and struggles with emotional stability were reported on August 19, 2014. (Tr. at 376).

On August 28, 2014, Claimant reported similar issues to Ms. Collier. (Tr. at 377). She was upset with her husband, who had restricted her access to finances due to her prior impulsive spending. (*Id.*). Ms. Collier felt that Claimant's function was declining, and she was amotivational. (*Id.*). Claimant indicated that her medications were helping, but not enough. (*Id.*). She reported spending several hours crying in bed each day. (*Id.*). Ms. Collier encouraged Claimant to find a hobby, or try volunteering as part of her treatment plan. (*Id.*). In her next session on September 11, 2014, Claimant arrived "with a pronounced pattern of disorganized thinking and mild confusion." (Tr. at 378). She stated that the family depended on her "to fix things," but then shut her out. (*Id.*). Ms. Collier noted that Claimant would appear to be doing well and then would abruptly "collapse into the mania and hypomania." (*Id.*). Claimant reported sustained bouts of crying and an inability to function at even a low level of housework. (*Id.*). Ms. Collier stated that the symptoms associated with Claimant's "debilitating" mental health disorders were significantly impacting her life, so much so that Claimant needed to consider CRU treatment, as well as a change in medication. (*Id.*). On September 15, 2014, Claimant described feeling pressured by demands from family members and a lack of attention from her husband. (Tr. at 379). Ms. Collier noted that Claimant had been crying non-stop

for several days, had been unable to do housework or participate in family activities, had been avoiding bathing, and was flat and tearful in session. (*Id.*). She suggested a stay in the local CRU, and Claimant agreed. Claimant's husband transported her there that day. (*Id.*).

Later that day at Prestera's High Intensity Unit, Claimant was assessed by Crystal Cole, RN. (Tr. at 407). Claimant was found to have limited impairments in activities of daily living and maintaining relationships, but had significant impairments in personal safety and social situations. (Tr. at 409). On a Symptom Acuity chart, Claimant was listed as "Acute/Crisis" in the categories of anxiety, depression, and suicidal; she was listed as "Severe" under hope/helplessness, self-injurious, and self-neglect; and she was moderate or mild for a variety of other categories. (Tr. at 411-412). Under the Adult MHSA Functional Assessment, Claimant was described as presenting Moderate Dysfunction for the categories of "self-care," "impair-other," and "task performance"; Mild Dysfunction for "impair"; and Severe Dysfunction for the "mental" category. (Tr. at 412-13). On MSE, Claimant was withdrawn, with a blunted affect and "overwhelmed" coping skills, but was otherwise within normal limits. (Tr. at 413-14).

On September 16, 2014, Claimant reported in a therapy session that her suicidal thoughts were at 10 on a 10-point scale at admission and were now down to 7. (Tr. at 439). She reported family stressors as being what pushed her toward having depressive thoughts and suicidal ideations. (*Id.*). Later that day, Claimant underwent a psychiatric evaluation by Marc Spelar, MD. (Tr. at 457). During the evaluation, Claimant reported that she had begun to feel more secure in her marriage until her husband stated he needed to spend more time taking care of his ailing parents. (*Id.*). She then began to feel a loss of support, which led to increased depression and anxiety. (*Id.*). This all reached a boiling

18

point on September 15, when she woke up with suicidal ideation and rushed to her therapist, Ms. Collier. (*Id.*). She complained of continuing depression, although she had some improvement in her suicidal ideation. Dr. Spelar noted normal findings in an MSE, except that Claimant's mood was anxious and she had suicidal ideation. (Tr. at 458-59). Dr. Spelar diagnosed Claimant with Bipolar II Disorder; Anxiety Disorder, NOS; and Personality Disorder, NOS. (Tr. at 459-60). Claimant was given a GAF score of 45. (Tr. at 460).

Under the treatment plan section, Dr. Spelar expressed some skepticism about Claimant's motives, commenting that Claimant had an exacerbation of her symptoms and required admission to the crisis unit at precisely the same time that her husband began to devote more time to his sick parents. (Tr. at 461). However, Dr. Spelar acknowledged that Claimant "does have a genuine pathology that we will be addressing during this admission." (*Id.*). Dr. Spelar documented that it was difficult to get Claimant to focus on her symptoms rather than "psychosocial/interpersonal topics." (*Id.*). He considered a treatment plan of Wellbutrin or Effexor, having previously noted that Claimant was taken off Lithium by Dr. Thornton, who felt the medication was dangerous. (Tr. at 457, 461). Dr. Spelar indicated that Claimant would also benefit from both individual and couples therapy.

On September 17, 2014, Claimant attended a therapy session with Christopher Kidd, MS. (Tr. at 440). Claimant described a conversation preceding her suicidal ideation on September 14, 2014, with her biological sister which had precipitated negative thoughts about her past. (*Id.*). Mr. Kidd assessed Claimant as depressed, but no longer suicidal. (*Id.*). Later that day, Claimant presented at a medication management session with Dr. Spelar. (Tr. at 608). He again expressed skepticism regarding Claimant's self-

reported symptoms. (*Id.*). Dr. Spelar reported mostly normal MSE results, although he did note possible operancy and narcissism issues. He assigned Claimant a GAF score of 45 and began a treatment plan of Topomax, Xanax, Wellbutrin, and Clonidine. (Tr. at 608-11).

On September 18, 2014, Claimant attended another therapy session with Mr. Kidd. (Tr. at 442). Claimant's described her mood as "good," and her affect was euthymic and dysphoric. (*Id.*). Mr. Kidd noted that Claimant continued to struggle with communication and engaged in tangential and disconnected thoughts with the need for frequent redirection; however, she reported a decrease in suicidal thoughts and expressed the desire to go home. (Tr. at 442-43). In a subsequent treatment plan meeting, Dr. Spelar gave Claimant a GAF score of 45 and outlined coping plans to help her deal with day-to-day stressors. (Tr. at 731-33). Claimant was discharged later that day. (Tr. at 718).

On September 25, 2014, Claimant returned to therapy with Ms. Collier. (Tr. at 380). She described "mixed" results from the CRU stay. (*Id.*). Claimant now identified childhood abuse by her brother, which began when she was five and continued until she was 16, as the source of many of her problems. (*Id.*). She continued to stress about financial problems and teared-up during the session. (*Id.*). However, she reported an improvement in her relationship with her husband. (*Id.*). She agreed to try to keep to a schedule for sleeping and medication using a journal. (*Id.*).  On October 7, 2014, Claimant attended a medication management session with Dr. Thornton. (Tr. at 620). He reported mostly normal MSE results, with the exception of a constricted affect and continuing depression. (Tr. at 620-21). He assessed Claimant's GAF score as 55, discontinued her Clonidine prescription, and increased her Wellbutrin dosage. (Tr. at 620-21).

On October 13, 2014, Claimant reported feeling down in her therapy session with

Ms. Collier, although she did report some benefit from the new medication plan. (Tr. at 381). Ms. Collier noted that Claimant was deflecting and difficult to redirect. (*Id.*). Claimant was again encouraged to begin hobbies and attempt to socialize. (*Id.*). During her October 23, 2014 session with Ms. Collier, Claimant described dealing with familial stress related to her mother in-law's illness and the possibility of her step-daughter and husband moving in with Claimant and her family. (Tr. at 382).

On November 6, 2014, Claimant arrived at Dr. Thornton's office for a medication management meeting. (Tr. at 622). Dr. Thornton believed Claimant's status was improving. He assigned her a GAF score of 60 and continued her medications. (Tr. at 625-26). However, later that day in her meeting with Ms. Collier, Claimant stated that her depression was "worse." (Tr. at 383). Claimant appeared stressed and anxious, complaining of worsening family and marital discord. Ms. Collier described Claimant as "crisis prone" with a "strategy" of "deflection." (*Id.*). The session was focused on how to get Claimant through her mini-crises and on to resolving her larger underlying problems, such as, her unstable marriage. Ms. Collier noted that Claimant was unwilling to accept the fact that she had symptoms—instead, stating that she was "just a crazy kinda girl"— while her husband was unwilling to educate himself on how to manage Claimant's symptoms. (*Id.*). In that session's MSE, Ms. Collier found Claimant's affect to be expansive; her insight was absent; her speech was pressured; and her thought processes were a flight of ideas. (Tr. at 383-84). Ms. Collier found Claimant to be a bit manic, with difficulty focusing. Ms. Collier encouraged Claimant to reach a better understanding of her symptoms. (Tr. at 384).

At the following session on November 20, 2014, Claimant was reflective and discussed her history of abuse and the events of the previous year. (Tr. at 386). Claimant's

affect was appropriate, but labile; her attention and concentration were fair; her judgment was moderately impaired; she had partial insight; and she spoke with slow and pressured speech. (*Id.*). Claimant related dealing with a family dog that died, and stress from the need to care for ill in-laws. (Tr. at 384). She was crying all day at times, but presented no observable mania. (*Id.*). Ms. Collier gave Claimant a crisis line number and suggested that she consider inpatient care if her mood worsened. (*Id.*).

On December 4, 2014, Claimant was in session with Ms. Collier when she abruptly reported that she needed to be transported to the CRU, stating "I don't feel safe." (Tr. at 390). Claimant reported that she was not benefitting from her current medication regimen and had been struggling with feeling distant from her husband. (*Id.*). Ms. Collier documented that Claimant was to be transported to the CRU that day. (*Id.*).

Once at Prestera's Logan CRU, Claimant was assessed by Mr. Kidd. (Tr. at 423). She presented as having limited impairments in activities of daily living and maintaining relationships, but with significant impairments in personal safety and social situations. (Tr. at 425). Claimant displayed a mix of severe, acute, moderate and mild symptoms in her Symptom Acuity Chart. (Tr. at 427-28). In her MHSA assessment, Claimant displayed moderate dysfunction in all but the mental category, which was listed as severe. (Tr. at 428-29). Mr. Kidd noted family dysfunction across several generations, which had a negative influence on Claimant's status. (Tr. at 430). Claimant reported feeling "worthless" in a session with Kimberly Ellis, RN. (Tr. at 659). She also described feeling suicidal for the past couple days and stated that she did not believe Wellbutrin was working. (*Id.*). Claimant stated she was lonely and withdrawn and felt she did not want to be around anyone. (Tr. at 660). Ms. Ellis gave her a GAF score of 60. (Tr. at 680).

On December 5, 2014, Shelba Workman, APRN, performed a psychiatric

evaluation of Claimant. (Tr. at 463). Ms. Workman acknowledged Claimant's belief that Wellbutrin was not working and that she slept and cried all the time. (*Id.*). Claimant reported that she tried to return to work at a local restaurant in February 2014, but was unable to continue. (*Id.*). Claimant's MSE results were normal, other than a dysphoric affect, negative mood, and some impaired concentration and calculation. Claimant was assessed with a GAF score of 45. (Tr. at 464-66). Ms. Workman prescribed Remeron to help with Claimant's sleep and depression. (Tr. at 467). The same day, Claimant was again seen by Mr. Kidd. (Tr. at 708). She reported symptoms of crying and depression that had lasted for more than a month and indicated that she had a depressed mood for most of the day. (*Id.*). She also described an inability to think or concentrate for most of the day during that same period. (*Id.*). Claimant had been experiencing frequent nightmares of past abuse. (*Id.*). She stated she often became sweaty, nauseous and dizzy during "triggers;" which could be caused by going out or even thinking of going out. (Tr. at 708-709). Mr. Kidd assigned Claimant a GAF score of 40.[3] (Tr. at 714).

On December 6, 2014, Claimant attended a medication management session with Dr. Spelar. (Tr. at 628). Claimant initially stated that the Wellbutrin was not working, then added that she was feeling lonely due to the absence of her husband. (*Id.*). Dr. Spelar noted that she had some success with Lithium in the past, but had been told it was "dangerous" because of the potential to overdose. (Tr. at 628-29). He diagnosed her with Bipolar II Disorder; Anxiety Disorder, NOS; and Personality Disorder, NOS. Claimant

---

[3] A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM-IV at 32.

was assigned a GAF score of 45. (Tr. at 631-32). They discussed medication options, and Dr. Spelar suggested trying Lithium again, believing the benefits could outweigh the risks. (Tr. at 633). Claimant agreed to start a trial of Lithium. (*Id.*).

The next day, Doctor Spelar prescribed the Lithium, continued Topomax and Xanax, and signed off on the Remeron prescription proposed by Ms. Workman. (Tr. at 639). He again gave Claimant a GAF score of 45. (Tr. at 638). Dr. Spelar noted that Dr. Thornton was retiring, and that Claimant's medications would begin to be overseen by Ms. Workman. (Tr. at 639). Claimant asked him if he and Ms. Workman would help her get disability, as "Dr. Thornton agrees I am disabled mentally." (*Id.*). Dr. Spelar stated he would fill out any paperwork objectively and honestly, but that they did not make disability determinations. (*Id.*).

Claimant was discharged from the CRU on December 8, 2014. (Tr. at 720). Ms. Workman had a final session with Claimant where she reported a mostly normal MSE and assigned her a GAF score of 45. (Tr. at 643-45). Ms. Workman noted that Lithium had been ordered, and they would continue to monitor Claimant's medications. (Tr. at 646).

On December 11, 2014, Claimant again met with Ms. Workman, who ordered a Lithium level test. (Tr. at 886). She gave Claimant a GAF score of 45. (*Id.*). Claimant then met with Ms. Collier for a therapy session. (Tr. at 767). At the session, Claimant's affect was labile; she was easily distracted, displayed moderately impaired judgment, and had a flight of ideas. (Tr. at 767-68.). Ms. Collier noted that Claimant's daily function continued to be poor. (Tr. at 768). She opined that Claimant "willfully overrides her knowledge and repeats the same mistakes over and over." (*Id.*). Claimant reported taking all her medications. (*Id.*).

On December 17, 2014, Ms. Collier indicated that Claimant had marked focus and concentration issues, which were related to her failure to keep up with medication dosages. (Tr. at 770). Claimant stated that she was taking her medicines, but conceded that she did forget sometimes. (Tr. at 770). On January 7, 2015, Claimant had another therapy session and reported little change. (Tr. at 773-74). On January 12, 2015, she met with Ms. Workman for a medication management session and reported some improvement. (Tr. at 889). Ms. Workman gave Claimant a GAF score of 60 and continued her Topomax, Remeron, and Lithium prescriptions. (Tr. at 892-93). The following week, Ms. Collier reported slow, but steady, progress in Claimant's mental health. (Tr. at 776). Claimant believed her medications were helping. (*Id.*).

Through February 2015, Claimant continued to report benefits from her medication regimen, despite some conflict with family members. (Tr. at 779, 782). However, in a medication management meeting with Ms. Workman on March 9, 2015, Claimant reported that she was struggling with her niece's recent overdose death and the demands of caring for her ailing in-laws, which she felt incapable of doing. (Tr. at 895). At her next therapy session on March 16, Claimant told Ms. Collier that her medications were not working, and she wanted new ones. (Tr. at 785). Ms. Collier indicated that Claimant had not had any significant change in her symptoms and might just have unrealistic expectations for what the medications could accomplish. (Tr. at 786).

On March 20, 2015, Ms. Collier reported that Claimant had been taken off all medications, so that laboratory studies could be performed before prescribing medications again. (Tr. at 788). Claimant complained of having a "terrible" week with major family changes. Ms. Collier documented that Claimant was easily distracted, with impaired judgment and absent insight. She was talking rapidly, with pressured speech,

and her thoughts process was described as a flight of ideas. (Tr. at 788). Ms. Collier commented that Claimant was often off topic and giggled inappropriately mid-sentence. (Tr. at 789). Her mood was changing rapidly. Due to her instability, Ms. Collier felt that "[l]ater this week it's not looking good for client to remain out of CRU." (*Id.*).

On April 14, 2015, Claimant met with Ms. Workman for a medication management session. (Tr. at 941). Claimant related that she had medical issues with her kidneys and was told that the problems could be related to Lithium. (Tr. at 941). For that reason, Claimant no longer wanted to take Lithium. (*Id.*). Claimant said she had been depressed a lot recently and been having "a lot of ups and downs." (*Id.*). Ms. Workman assigned Claimant a GAF score of 45, continued Claimant's Topomax and Remeron prescriptions, and planned to request approval from Dr. Spelar to reinstitute Claimant's Xanax prescription. (Tr. at 943-44). Claimant met with Ms. Workman again on June 9, 2015. (Tr. at 946). She reported being "kind of depressed." (Tr. at 947). On MSE, Claimant had a dysphoric affect, impaired memory and judgment, and partial insight. Her GAF score was 60. (Tr. at 947-48). Claimant's medications remained the same. (Tr. at 949).

Claimant met with Ms. Collier for therapy on June 12, 2015. (Tr. at 1141). Ms. Collier stated that Claimant had daily mood instability, and her medicine was not as effective as she wanted. (Tr. at 1142). Claimant revealed that she was still struggling with familial conflict, and that her son was upset with her after she took him to the dentist to get his wisdom teeth removed. In addition, she and her stepdaughter had a "falling out" and were threatening each other with legal action. (Tr. at 1141-42). Her MSE showed a labile affect, lack of concentration and attention, moderately impaired judgment, pressured and rapid speech, and abnormal thought processes. (Tr. at 1141). On June 24, 2015, Claimant reported feeling "down and out." (Tr. at 1139). She felt unable to care for

her elderly father-in-law and this created friction in the family. (*Id.*). Claimant's MSE was again abnormal in affect, concentration, attention, insight, speech, and thought process. (*Id.*)

On July 17, 2015, Claimant reported "spiraling down" into bipolar symptoms, following the death of her father-in-law. (Tr. at 1137). She also reported feuding with her husband. (Tr. at 1138). On August 10, 2015, Claimant met with Ms. Workman for medication management. (Tr. at 1109). She reported doing nothing beyond "laying around the house," as she had no energy to go out and do anything. (*Id.*). Claimant's affect was dysphoric; she was easily distracted; her memory and judgment were impaired; and her insight was partial. (Tr. at 1110). Ms. Workman assigned Claimant a GAF score of 60, and did not change her medications. (Tr. at 1112).

On August 26, 2015, Claimant described experiencing recent suicidal thoughts. (Tr. at 1135). She began to cry during the session and said she had experienced "a bad few days." (*Id.*). Claimant also referenced conflict with other family members. (Tr. at 1136). She became withdrawn in the session and stopped responding. Ms. Collier suggested a CRU stay which Claimant declined. (*Id.*). Later that day, she told Ms. Workman that she was sleeping all the time and did not want to do anything. (Tr. at 1114). Claimant reported taking out all her pills and wanting to overdose, but did not want to be admitted for inpatient care. (*Id.*). Claimant said she had been going to the library to work on crafts. (*Id.*). Ms. Workman assigned her a GAF score of 60. (Tr. at 1116).  Ms. Workman changed Claimant's medications from a previous prescription of Trileptal to Depakote. (Tr. at 1117).

Claimant arrived for her session on September 3, 2015, looking "unkempt and sad." (Tr. at 1133). She reported taking her medicines and benefitting, but also feeling

hopeless and alone. (*Id.*). Her affect was labile, judgment moderately impaired, speech pressured, insight partial, and she was easily distracted with a flight of ideas. (*Id.*). Claimant agreed to attempt to get back on a daily schedule and begin journaling again. (Tr. at 1134). Manuel Valencia, MD, met with Claimant for her September 7, 2015, medication management session. (Tr. at 1119). He reported Claimant was having multiple panic attacks a day, as well as depression. (*Id.*). Dr. Valencia announced a plan to begin tapering Claimant off of Topamax, to discontinue Depakote, restart Trileptal, continue Remeron, continue Xanax, switch to Klonopin, and retry Bupropion SR. (Tr. at 1122).

In her notes for a September 9, 2015 session, Ms. Collier stated "[Claimant] has a chronic mental health condition. She is unable to work and maintain a schedule that would make work successful." (Tr. at 1131). Ms. Collier noted that Claimant focuses on the negative and lets the opinions of other hold too much weight. (Tr. at 1132). Ms. Collier encouraged Claimant to find daily activities that she enjoyed to help pass the time and find meaning in her life. (*Id.*). On September 23, 2015, Claimant reported feeling better, but still experiencing painful emotional bouts. (Tr. at 1129). Ms. Collier noted that Claimant had "major borderline personality traits and has yet to accept and begin to work on how she can change this condition." (Tr. at 1130). Claimant agreed to try strategies to cope with her symptoms and to try to ride with her husband on his weekend bus routes. (*Id.*). Claimant's MSE was abnormal in mood, affect, concentration and attention, judgment, insight, speech, and thought process. (Tr. at 1129).

On October 5, 2015, Claimant met with Ms. Workman for medication management. (Tr. at 1124). She reported crying frequently, and wanted her medications adjusted saying they were not working. (*Id.*). Ms. Workman added a prescription for Abilify. (Tr. at 1127). On November 18, 2105, Claimant again met with Ms. Collier for

therapy. (Tr. at 1164). Claimant admitted to missing doses of medications as she sometimes slept through them. However, she was adamant that the medications were not working as they should. (*Id.*). Claimant described feeling anxious, but was riding with her husband on his bus routes and sleeping on the return trip. (Tr. at 1165).

Claimant had a medication management session with Ms. Workman on November 30, 2015. (Tr. at 1172). She reported she was not able to afford Abilify, although it had worked best for her. (Tr. at 1172). She said she napped all day and was unable to do chores. (*Id.*). Claimant stated, "When I go places I have to have my safety net which is [my husband]." (*Id.*). She reminisced about being able to work 50-60 hours a week in the past, stating, "I changed when I tried to kill myself. I don't know how to fix myself." (*Id.*). Ms. Workman noted, however, that Claimant made no effort to find ways to improve her situation, focusing only on the reasons why she was unable to do things. Ms. Workman did not change Claimant's prescriptions which consisted of Xanax, Remeron, and Topomax. (Tr. at 1175).

On December 9, 2015, Claimant reported taking her medications with minimal benefit. (Tr. at 1167). On January 5, 2016, she described increased stress due to her inability to take care of her mother-in-law. (Tr. at 1169). Claimant agreed to help her mother-in-law set up professional help. (*Id.*). On January 20, 2016, she reported arguing with her husband, sleeping during the day, and never leaving the house. (Tr. at 1170-71). On January 25, 2016, Claimant's Remeron prescription was increased, but her medications remained otherwise unchanged. (Tr. at 1263). On January 27, 2016, she reported to Ms. Collier that she was taking all of her medications, but only receiving mixed benefits. (Tr. at 1256). She was worried about her husband having an affair and took walks outside when the weather permitted. (Tr. at 1257). Ms. Collier noted primarily abnormal

findings on MSE during this time; although, Ms. Workman made more normal findings. (Tr. at 1166, 1168, 1170, 1261-62).

On February 10, 2016, Ms. Collier noted that Claimant was in a "gloomy" mood. (Tr. at 1258). Ms. Collier predicted that Claimant would likely end up in the local CSU for a stay soon. (Tr. at 1259). She was not taking her medications as directed. (*Id.*). On February 24, 2016, Claimant and Ms. Collier worked on Claimant's increasing paranoia regarding her husband's suspected infidelity. (Tr. at 1290-91). Claimant reported taking all medications as prescribed, but only minimally benefitting. (Tr. at 1290). At a March 11, 2016 appointment, Claimant was still stressed about the possibility of her husband having an affair. (Tr. at 1292-93). Ms. Collier documented that Claimant had been suffering from an unstable mood and was experiencing spikes in mania. (Tr. at 1293). Claimant's suspicion of her husband's extramarital affair continued through her March 21, 2016 therapy session, prompting Ms. Collier to describe her as "paranoid." (Tr. at 1294).

On April 20, 2016, Claimant reported taking her medications and seeing "some benefit." (Tr. at 1296). However, Ms. Collier was concerned about Claimant's behavior and suggested that she consider admission to the CRU if she worsened. Ms. Collier also felt that Claimant should set up an appointment with Ms. Workman to discuss a new medication regimen. (Tr. at 1297). On May 17, 2016, Claimant described increased stress due to the difficulties of caring for her mother-in-law. (Tr. at 1298). She reported taking her medicines as prescribed and seeing only marginal benefits. (*Id.*). On June 6, 2016, Claimant arrived nicely attired for a wake she was attending later that day. (Tr. at 1300). She described increased stress as her son had begun working with Claimant's brother who had abused her. Her son was asking questions about why Claimant and her brother did

not see each other. (*Id.*).

On June 30, 2016, Claimant reported taking all medications as prescribed and was doing better. (Tr. at 1302). She continued to stress about her husband's suspected infidelity through the summer of 2016. (Tr. at 1304, 1306, 1309). On September 21, 2016, Claimant reported continuing bouts of depression. (Tr. at 1310). She said she was taking all medications as prescribed, but was seeing little benefit. (*Id.*). Claimant identified continuing conflict with family members as the root of her instability. (Tr. at 1311). Ms. Collier worked on strategies with Claimant to mitigate her propensity toward making rash decisions during periods of emotional instability. (*Id.*). Ms. Collier continued to encourage Claimant to get involved in activities such as crafts or volunteer work. (*Id.*). Throughout this period, Ms. Collier documented numerous abnormalities on Claimant's mental status examinations. (Tr. at 1296, 1298, 1300, 1302, 1304, 1306, 1308, 1310).

### B. Evaluations and Opinions

On September 12, 2014, agency consultant, Paula Bickham, Ph.D., reviewed Claimant's mental health records at the request of the SSA. (Tr. at 77-82). Dr. Bickham examined the criteria under Listings 12.04, 12.06, and 12.08, finding that Claimant had a medically determinable impairment under each listing; however, her symptoms did not precisely satisfy the diagnostic criteria of any of them. Under the paragraph "B" criteria, Dr. Bickham opined that Claimant had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation, each of extended duration. Dr. Bickham did not believe Claimant met the paragraph "C" criteria of any listing. (Tr. at 79). Dr. Bickham completed a mental residual functional capacity assessment in which she found Claimant not to be significantly limited in most

31

work-related activities, with the exception of: the ability to complete a normal workday and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with peers and co-workers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. With respect to these activities, Dr. Bickham felt Claimant was moderately limited. Dr. Bickham went on to find that, despite these moderate limitations, Claimant retained the ability to learn and work as long as she had limited contact with others. (Tr. at 82).

On January 30, 2015, Jeff Boggess, Ph.D., provided a second evaluation of Claimant's mental impairments at the request of the SSA. (Tr. at 94). Dr. Boggess did not examine Claimant, but reviewed her mental health records. He examined the criteria under Listings 12.04, 12.06, and 12.08, finding that Claimant had a medically determinable impairment under each listing; however, her symptoms did not precisely satisfy the diagnostic criteria of any of them. Under the paragraph "B" criteria, Dr. Boggess opined that Claimant had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation, each of extended duration. He did not believe that Claimant met the paragraph "C" criteria of any listing. (Tr. at 94). He later found that one or more of Claimant's medically determinable impairment(s) could reasonably be expected to produce her professed symptoms; however, he went on to find that her statements about the intensity,

persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence alone. (*Id.*). Dr. Boggess stated that he considered Claimant's ADLs and "Medication Treatment" as the most informative factors in assessing the credibility of Claimant's statements. (*Id.*).

When assessing Claimant's mental residual functional capacity assessment ("MRFC"), Dr. Boggess found several limitations. (Tr. at 96-97). He stated that Claimant did have sustained concentration and persistence limitations in that she was moderately limited in her ability to complete a normal workday and workweek without interruptions and without an unreasonable number and length of rest periods due to psychologically based symptoms. (Tr. at 96). Dr. Boggess also found that Claimant had social interaction limitations as she was moderately limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, and in her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. at 96-97).

Despite these findings, Dr. Boggess found that Claimant retained the ability to "learn and perform routine work like activity with limited contact w[ith] others." (Tr. at 97). In his explanation, Dr. Boggess stated that Claimant appeared only partially credible. (*Id.*). He realized that "Claimant does not always exercise good judgment regarding social relationships nor does she appear to have adequate social skills." (*Id.*). Dr. Boggess noted that Claimant reported anxiety in public but that this was not reported to her therapist. (*Id.*). He discussed Claimant's admittance to Prestera CU in September 2014, but not her 2013 suicide attempt or her more recent December 2014 CU admittance. (*Id.*). He considered that Claimant's GAF scores ranged from 45-55, and that she had been marked

as "focused" in her last MSE. (*Id.*). Finally, he observed that she was able to shop, drive, fix simple meals, and take her son to drug court. (*Id.*).

On October 28, 2016, Florence Collier completed a mental assessment of ability to do work-related activities form. (Tr. at 1324-26). She indicated that Claimant had been diagnosed with Bipolar I Disorder, and that she treated Claimant biweekly. (Tr. at 1325). Ms. Collier identified "marked" limitations in Claimant's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration. (*Id.*). When asked to describe any limitations and include the medical findings that support the assessment, Ms. Collier replied, "mood instability-poor, impulsive decisions." (*Id.*). Ms. Collier also indicated that Claimant would have "marked" difficulties understanding, remembering, and carrying out complex job instructions; understanding, remembering, and carrying out detailed, but not complex job instructions; and "moderate" difficulties understanding, remembering, and carrying out simple job instructions. (*Id.*). Here, Ms. Collier remarked that Claimant's "limited capacity to make accurate judgments" supported her assessment. (*Id.*).

For Claimant's ability to adjust personally and socially, Ms. Collier stipulated that Claimant would have "marked" difficulties completing a normal work day or week without unreasonable interruptions due to her psychologically based symptoms; she would have "moderate" difficulties behaving in an emotionally stable manner and relating predictably in social situations; and she would have "slight" difficulties maintaining personal appearance due to her disruptive "mood instability." (Tr. at 1326). Ms. Collier also stated that Claimant's ability to work would be negatively affected by her "cognitive decisions, judgment, limited insight." (*Id.*). Finally, Ms. Collier denoted that Claimant was unable

34

to manage benefits in her own interest. (*Id.*).

### C. Statements and Testimony at Administrative Hearing

Claimant completed an Adult Function Report on September 3, 2014. (Tr. at 219-26). Claimant stated she was unable to complete tasks due to her inability to concentrate. She said being in crowds made her nervous and would cause panic attacks. (Tr. at 219). Claimant had difficulty sleeping. Sometimes she would not bathe or dress and would need to be reminded to do these tasks by her husband. She also needed help remembering to take her medications. Claimant would sometimes make sandwiches or cereal for herself, but her family did the household chores. When asked why she did not participate, Claimant replied: "don't feel like it." (Tr. at 221-22).

Claimant stated she only went outside when she had to, such as for appointments. When she did, she would drive. Claimant was capable of going out alone. Claimant would shop in stores if it was "something we have to have right then," but noted it made her anxiety "very bad." She would do so once a month and would be inside the store for "minutes." (Tr. at 222). Claimant said she used to read and do crafts, but no longer had any interest in such activities. She did not spend time with others. She took her son to drug court every other Wednesday, "only because it was court ordered," and would take him to doctor's appointments "only if I can't find someone else to do it." (Tr. at 223).

Claimant said she did have problems getting along with family and others, as "they don't like it because I don't get out of the house." She said she used to love to go out, but she was now afraid to be around people. Claimant had difficulties completing tasks and would forget things if they were not written down. She would stutter when nervous. She had difficulty following instructions and concentrating. (Tr. at 224). Claimant stated she tried to get along with authority figures, "but some people you can't." Claimant indicated

she did not go out much and avoided people. She did not handle stress or changes in routine well and worried constantly. (Tr. at 225).

Claimant completed a second Adult Function Report on December 11, 2014. (Tr. at 242-49). This report was essentially identical to Claimant's prior report, except she added that she had problems eating and sometimes she did not want to eat. (Tr. at 243). Claimant indicated that she did not complete household chores, because she forgot or did not feel well enough to do them. (Tr. at 245). She also stated in this form that she would have to be reminded when she needed to go places. (Tr. at 246).

At the administrative hearing, Claimant's attorney opened by asking the ALJ to consider Claimant's case under listing 12.04; specifically, under 12.04C(2). (Tr. at 42). She drew the ALJ's attention to the four periods between December 2013 and December 2014, when Claimant was admitted to Prestera's Crisis Stabilization Units, as well as her attempted suicide in December 2013. (Tr. at 42). Claimant's attorney discussed the medical records and noted there had not been an agency review of the entire record since 2014. (Tr. at 44).

Claimant testified that she completed high school and had some vocational training. (Tr. at 45). Her last job was at a local pizza restaurant in 2014. (Tr. at 46). She stated she began work in 2014, but was only able to work for a few weeks before her anxiety became too overwhelming. (*Id.*). Claimant explained that she was unable to clean the house due to her symptoms, and for the last year or so, she had relied on relatives to cook and clean. (Tr. at 53). Claimant stated that she would usually lay in bed and cry all day. Her husband would have to force her to bathe. (Tr. at 54). Claimant did not leave the house often, although she would occasionally go to a doctor's appointment alone. (Tr. at 54-55). Claimant recounted that on one occasion, she became so anxious traveling to a

36

doctor's appointment by herself that she was unable to control her bowels. (Tr. at 55). She testified that she tried to go to family events, but experienced panic attacks, which caused her to leave. (Tr. at 56).

Claimant explained that she has good days and bad days in a typical month. A good day was when she could get up and do a couple loads of laundry and eat, but those days were infrequent. A bad day was when she was unable to get out of bed or stop crying. On an average day, Claimant usually just stayed on the couch. She estimated she probably had 10 bad days in an average month. She stated she believed her current medications helped; she was on stronger medicines like Lithium, but it affected her kidneys. (Tr. at 57). She stated she experienced panic attacks 3-4 times per week, which were sometimes precipitated by going out in public. (Tr. at 59-60). She had not returned to the CRU since 2014, but testified that she had some "close calls." (Tr. at 58). Claimant felt she would be unable to maintain employment as she was "not reliable." (Tr. at 61).

Vocational Expert, Harry Tanzey, also testified at the hearing. (Tr. at 62). He stated that a person limited to light work and to "understanding, remembering, and carrying out simple instructions; to performing routine and repetitive tasks; who could not perform work at a rapid pace or requiring strict production quotas; who would be limited to occasional interaction with coworkers and supervisors and to no interaction with the public," would be able to find a significant number of jobs in the national economy. (Tr. at 64-65). Under questioning by Claimant's attorney, Mr. Tanzey stated that an individual who would have substandard job performance for one third of a normal workday or work week, and would additionally have a marked limitation in "being able to relate to coworkers appropriately; using judgment for even a simple routine decision making, interacting appropriately with supervisors, and a moderate limitation in being able to

behave in an emotionally stable manner," would not be able to compete in the national job market. (Tr. at 67).

After the ALJ released his written decision, Claimant submitted additional evidence in her appeal. The Appeals Council rejected most of the additional evidence, but did incorporate into the record a letter by Claimant. (Tr. at 2, 6). In the letter, Claimant attempted to clarify some of the activities that the ALJ found probative in reaching his decision. (Tr. at 172). She explained that the crafts she did at the library consisted of a "small card," and it was part of her treatment plan, not something she did on a regular basis. (*Id.*). She described her weekend bus rides with her husband as an "epic fail," saying she had panic attacks and wet herself during the experiences. (Tr. at 173). She disputes at length most of the ALJ's findings regarding her activities in the remainder of the letter. (Tr. at 172-77).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.

2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.    Discussion**

Claimant raises two challenges to the Commissioner's decision. Claimant first argues that the ALJ's finding that she did not meet the criteria of Listing 12.04C(2) was not supported by substantial evidence and, thus, requires remand. Claimant contends that the ALJ's analysis of the 12.04C criteria was perfunctory and based solely on the outdated opinions of Agency evaluators, who, as the ALJ himself recognized, did not correctly assess the extent of Claimant's limitations. (ECF No. 13, at 15-17). In the absence of any competent medical opinions to support his decision, Claimant argues, the ALJ merely used his own judgment to discredit the abundant medical evidence that Claimant did in fact meet listing 12.04C. (*Id.* at 18). Claimant also disputes the ALJ's treatment of Ms. Collier's opinion. While admitting Ms. Collier did not qualify as a "medical source," Claimant contends that the ALJ inappropriately disregarded her opinion in light of her longstanding treatment relationship with Claimant and the lack of other qualified opinions in the record. (ECF No. 13, at 8).

### A. Listing 12.04C Analysis

Section 12.00 of the Listing involves Mental Disorders, which at the time of the ALJ's decision were arranged in nine diagnostic categories, including Listing 12.04, pertaining to Affective Disorders. To trigger review under Listing 12.04, a claimant is first required to produce medical evidence establishing the presence of an affective disorder,

defined as a mental state "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 ¶ 12.04. To meet or equal Listing 12.04, the claimant must then demonstrate that she satisfies the severity criteria of paragraphs A and B, or alternatively, that she satisfies the criteria of paragraph C. *Id.* Under paragraph C, the claimant must show a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated (reduced or weakened) by medication or psychosocial support" **and** that at least one out of three additional criteria is present. The second criterion, which Claimant purports to satisfy, requires evidence of "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." *Id.* at ¶ 12.04C(2).[4]

In this case, the ALJ considered whether Claimant met the criteria of Listing 12.04C, noting that the evidence, in general, failed to establish the presence of paragraph "C" criteria. (Tr. at 27). The ALJ first reviewed the decisions of the State agency consultants. With regard to the paragraph "C" criteria, he noted that both agency evaluators assessed that the evidence did not establish the criteria. (Tr. at 26). He went on to say: "The undersigned affords substantial weight to these opinions based upon their

---

[4] The undersigned notes that since the ALJ's written decision in November of 2016, the language of listing 12.04C(2) has been changed to "Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." However, this language, which became effective March 14, 2018, was not in effect at the time of the ALJ's decision, and he appropriately evaluated the claim under the listing as it existed at the time of the decision.

program knowledge and specialty in mental impairments; however, the collective record as detailed below supports the claimant is more limited." (*Id.*).

The ALJ then detailed the evidence regarding the paragraph "B" criteria. For Claimant's activities of daily living, he noted that she had no problems feeding herself or using the toilet independently. (*Id.*). In the medical record, she reported she was able to care for her personal needs, and that she could do crafts, laundry, and prepare sandwiches. (Tr. at 27). For social functioning, he pointed out that Claimant took her son to drug court, went to medical appointments and the library, maintained close relationships with her children, and accompanied her husband on his driving job. (*Id.*). In the category of concentration, persistence, or pace, the ALJ contrasted Claimant's reported difficulties with her ability to drive, watch a movie, and keep a food journal. (*Id.*). The ALJ assigned moderate difficulties for all three categories. (*Id.*). He next discussed episodes of decompensation, finding that Claimant had experienced one to two episodes of decompensation, that did not meet the specificity of extended duration. He only explicitly recognized Claimant's stay at Prestera from December 4, 2014 to December 8, 2014. (Tr. at 27). The ALJ found that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (*Id.*).

After his discussion of the paragraph "B" criteria, The ALJ returned to the paragraph "C" criteria. His discussion is reproduced in whole below:

"The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria because the record is void of evidence of repeated episodes of decompensation of extended duration, a residual disease process that has resulted in such marginal adjustment that even a minimum

> increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or the inability to function outside a highly supportive living arrangement or outside the area of the claimant's home."

(*Id.*). The ALJ then proceeded to detail his findings regarding Claimant's RFC. In doing so, he engaged in an extensive analysis of Claimant's activities which undermined her statements about the severity of her symptoms. (Tr. at 27-31). The ALJ noted that Claimant took her son to get his wisdom teeth pulled and did crafts at the library. (Tr. at 29, 30). She reported taking her medicines and benefitting from treatment. (Tr. at 30). The ALJ observed that in November 2015, Prestera records reflected that Claimant was missing doses of medication. (*Id.*). She reported going to her sister's house for Thanksgiving and again stated that her medications were helping. (*Id.*). He noted that Claimant described riding with her husband on his bus route. (*Id.*). She detailed agreeing to help her mother-in-law find a professional caregiver. (*Id.*). In February she reported walking outside if the weather permitted. (*Id.*). On April 14, 2016, she reported she was doing well. (Tr. at 30). In May 2016, she again described caring for her mother-in-law. (*Id.*). In June 2016, Claimant attended a funeral. (*Id.*). She denied wanting to change medications despite ruminating over her marital issues. (*Id.*).

The ALJ then stated that despite the additional functional limitations found for the RFC, Claimant did not have an impairment that would prevent her from engaging in competitive work activity. (*Id.*). He next addressed the opinion evidence. With regard to Ms. Collier's opinion, he stated that he rejected her opinion as she was, "not an acceptable medical source," and that furthermore, "the record, as a whole does not support her opinion." (Tr. at 31). In this regard, the ALJ remarked that as he had detailed above, the Claimant was able to, "provide care for others, travel and spend time with her spouse, do

42

laundry, attend medical appointments, watch movies and television, shop, do crafts, go to the library, go for walks, attend a funeral, and drive." (*Id.*). The ALJ stated that he had assigned only partial weight to the GAF scores. He elaborated on his reasoning, but did not directly discuss the GAF scores contained in the record. (*Id.*).

The Commissioner contends that the ALJ's decision regarding 12.04C(2) is supported by substantial evidence. She states that the ALJ validly relied on Dr. Bickham's opinion that Claimant did not meet the paragraph "C" criteria, points out that Ms. Collier's opinion deals with paragraph "B" criteria limitations, and emphasizes that the ALJ devoted "*nine paragraphs of analysis*" to the 12.04 listing. (ECF No. 14, at 14-15; Tr. 26-27 (emphasis original)).

While it is true that the ALJ devoted a significant portion of his written decision to Claimant's mental impairments, the quality of the 12.04C analysis cannot be judged on quantity alone. Indeed, the vast majority of the ALJ's discussion is focused on paragraph "B" criteria, not paragraph "C" criteria, and the decision contains no substantive analysis specific to Listing 12.04C(2). The problem with a lack of such analysis in this case is two-fold. First, Claimant's attorney explicitly argued that Claimant satisfied the criteria of Listing 12.04C(2), pointing to specific pieces of evidence in the record, which arguably supported that position. (Tr. at 42-44). The ALJ never directly addressed Claimant's argument, nor explained why the evidence cited by Claimant's counsel was unpersuasive.

Second, the record included numerous examples of Claimant decompensating, having variable success with medication and counseling, and demonstrating fluctuating ability to adjust to the daily demands of life. In this circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F. Supp. 2d. 384, 390 (D.

Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see, also, Ezzell v. Berryhill*, 688 Fed. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

Other courts that have considered this question have found that when an ALJ is asked to consider whether a claimant meets listing 12.04C(2), she must consider the evidence in the record that relates to the criteria specifically. A cursory statement that the claimant does not meet the criteria, even when coupled with more extensive analysis of the Claimant's functioning in other areas, does not create a basis on which to review the ALJ's decision. *See, e.g., Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *7 (D. Conn. Dec. 21, 2017). ("Although there is evidence in the record that would support the ALJ's conclusion, there is also evidence that indicates marginal adjustment. The ALJ's Decision contains no indication that he considered this evidence in relation to the second criterion beyond a conclusory statement that he considered paragraph "C." Thus, without an articulation of the ALJ's reasons, the court cannot review whether the ALJ considered the contrasting evidence or how the ALJ reached his conclusion.") The *Howarth* Court found the ALJ's explanation insufficient despite the fact that, "the ALJ did make findings in other parts of the decision that [the claimant's] impairments are only mild to moderate and that he is able to live on his own and take care

44

of his personal needs." *Id.*

Here, the ALJ's discussion of the Claimant's level of functioning does not directly address the issue raised by 12.04C(2); that being, whether a claimant can be expected to decompensate based on marginal increases in stress. In regard to the paragraph C(2) criteria specifically, the ALJ stated only "the evidence fails to establish the presence of the "paragraph C" criteria because the record is void of evidence of . . . a residual disease process that has resulted in such marginal adjustment that even a minimum increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. at 27). He additionally noted that he was assigning substantial weight to the opinions of the State agency consultants who had found that Claimant did not meet the paragraph "C" criteria. (Tr. at 26).

The Fourth Circuit has recognized that when considering whether a claimant meets a listing, the ALJ must consider how the claimant does or does not meet the requirements of the listing at some level of specificity. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (remanding because the ALJ "also failed to compare [the claimant's] symptoms to the requirements of any of the four listed impairments, except in a very summary way."). Other courts who have considered this question have found that, at least when there is some evidence in the record that tends to support a finding of potential decompensation, an ALJ must explain his reason for deciding the claimant is not likely to decompensate based on marginally increased demands.

In *Gonzalez v. Commissioner of Social Security*, No. 16 Civ. 8445 (KMK) (PED), 2017 WL 7310391 (S.D.N.Y. Dec. 21, 2017), report and recommendation adopted, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018), the court found the ALJ's conclusory statement, that "[t]here [wa]s no medical evidence or testimony" that plaintiff satisfied paragraph C, to

be inadequate. *Id.* at *10 (citation omitted). The court explained that the ALJ had ignored evidence of the claimant suffering from episodes of decompensation, "including withdrawal [fr]om situations, poor decision making, inability to appropriately accept supervision, ... deterioration from previous levels of functioning, ... and inability to adapt to changing demands of context." *Id.* "While this evidence d[id] not conclusively demonstrate" that the claimant met paragraph "C", it was "unclear [fr]om the face of the decision whether the ALJ even considered" that evidence, and thus, the court held that the ALJ had not "offered a meaningful analysis of the paragraph C criteria." *Id.* In *Lawrence v. Colvin*, No. 14–cv–00812–KMT, 2015 WL 5579432 (D. Colo. Sept. 23, 2015), the Court concluded that "[g]iven the absence of a sufficient explanation for the ALJ's paragraph C conclusion and the existence of uncontradicted and undisputed evidence" that the claimant met paragraph C(2), the ALJ had "not articulated a sufficient basis to determine whether" the paragraph C conclusion was supported by substantial evidence— a reversible error. *Id.* at *5.

The same court later decided that a disability determination did not provide a proper basis for review, even when the ALJ did provide some articulation of his reasoning. *See Sommers v. Berryhill*, No. 16-CV-002844-STV, 2018 WL 1115989, at *8 (D. Colo. Feb. 27, 2018). There, the ALJ stated that he did not believe the claimant would be likely to decompensate following a minimal increase in mental demands or a change in her environment as "[t]he record outlines she has struggled with living with her mother but managed this by participating in activities outside of the home." *Id.* (quoting ALJ). Furthermore, the ALJ referenced occasions when the claimant had not decompensated, and had been relatively stable in her mental health, including finding that the claimant went out almost every day, was able to shop, had been actively involved in group therapy,

and continued to drive. *Id.* at *10 (citing to ALJ's decision). The ALJ also found that the claimant had attempted to attend art school and stopped going primarily for financial reasons, rather than mental health symptoms, and noted that the claimant was active outside of the home and had gone on dates. *Id.* However, the court found that as the ALJ had not discussed the claimant's repeated mental breakdowns and ensuing hospitalizations, he had failed to adequately explain his rationale. *Id.*

The Commissioner argues that as the ALJ gave substantial weight to the opinions of the State evaluators, and as those evaluators both stated Claimant did not meet the "C" criteria, the ALJ's decision is supported by substantial evidence. (ECF No. 14 at 14). However, the ALJ never indicated why he found the opinions of the State consultants credible as to the Listing "C" criteria, and the opinions themselves merely state that "Evidence does not establish the presence of the "C" criteria." (Tr. at 79, 94). This does not provide a sufficient basis to review the ALJ's decision. In *Canady v. Colvin,* No. CA 5:12-2507-KDW, 2014 WL 878880, at *11 (D.S.C. Mar. 5, 2014), the court held that it was not able to determine whether an ALJ's decision was supported by substantial evidence when he provided no "substantive discussion of the Paragraph 'C' criteria." *Id.* at *10. There, the ALJ's reliance on the opinions of State evaluators was unavailing as their opinions provided "no explanation" of their reasoning in rejecting the claimant's paragraph "C" claims. *See Id.* at *11; *See also Howarth*, 2017 WL 6527432, at *7 (refusing to uphold an ALJ's decision that relied on State evaluators rejection of claimant's paragraph "C" claim where "neither opinion states the basis for this finding"). Also undermining the Commissioner's position is that the ALJ himself recognized the State evaluators did not have the benefit of the entire record in reaching their decisions and that Claimant was ultimately more limited than they had determined. (Tr. at 26). Despite

the Commissioner's arguments that paragraph "C" was adequately considered, the case law consistently suggests that when considering a claim under 12.04C, the ALJ must articulate some basis for deciding why the claimant does not meet that listing's requirements in particular.[5]

Here, Claimant's attorney specifically requested that the ALJ consider the case under listing 12.04C and pointed to evidence she believed supported the claim. (Tr. at 42-44). While none were for an extended duration, there were multiple examples of Claimant decompensating in the record. She was hospitalized for attempted suicide in December 2013, was admitted for inpatient care to Prestera CRU from December 27, 2013 through January 2, 2014, again from September 15, 2014 until September 18, 2014, and for a third time from December 4, 2014 until December 8, 2014. (Tr. at 321, 716, 718, 720). Additionally, Ms. Collier indicated she believed Claimant was decompensating and in danger of needing CRU stabilization several other times in her treatment records. (Tr. at 788, 1135, 1297).

While Claimant's episodes of decompensation in December 2013 followed the discovery of her extramarital affair, likely resulting in more than a marginal increase in stress, what brought on the remainder of the episodes was not always clear. (Tr. at 321). Ms. Collier seemed surprised by Claimant's request to be admitted in December 2014, noting she "abruptly" stated "she did not feel safe." (Tr. at 390). Leading up to her

---

[5] *See also Knight v. Colvin,* No. 1:15-CV-02402-SB, 2017 WL 89573, at *10–11 (D. Or. Jan. 10, 2017) (remanding where the ALJ merely concluded "the file contains no evidence of a tendency to decompensate."); *Higareda v. Colvin,* No. 4:15CV3135, 2016 WL 6078299, at *8–11 (D. Neb. Oct. 17, 2016) (remanding as the ALJ "treated 12.04(C) in such a conclusory manner" and overweighed State agency evaluators); *Morris v. Colvin,* No. 2:12-CV-595, 2013 WL 3467209, at *5 (S.D. Ohio July 10, 2013), report and recommendation adopted sub nom. *Morris v. Comm'r of Soc. Sec.,* No. 2:12-CV-00595, 2013 WL 4008774 (S.D. Ohio Aug. 5, 2013) (remanding for failure to consider Section C criteria specifically).

September 2014 admittance, Claimant had complained of family stressors and indicated she felt overwhelmed by their need to have her "fix things." (Tr. at 378). However, there was no indication of a major change in her circumstances or a marked increase in mental demands. She had consistently reported taking her medications and seeing little benefit leading up to the September 2014 CRU stay. (Tr. at 375, 378).

The GAF scores contained in the record might also provide some insight into Claimant's pattern of decompensation. Claimant received 41 GAF scores over the course of her treatment.[6] These ranged from a low of 40 to a high of 60. (Tr. at 714, 892). Her median GAF score was 50 and the mode was 45. The GAF score functions as a snapshot, and Claimant was assessed much more frequently following an episode of decompensation, sometimes multiple times in one day, meaning that they may not paint an accurate picture of Claimant's functioning as a whole, but the sheer number of assessments does increase their value in tracking Claimant's pattern of mental health.

Whatever conclusions, if any, the ALJ drew from these episodes cannot be reviewed by this Court as the ALJ never mentioned Claimant's CRU stays in his paragraph "C" criteria discussion. He briefly mentioned Claimant's 2013 suicide attempt while reviewing her functionality in the RFC assessment. (Tr. at 29). He also discussed her December 2014 CRU visit, but only to dismiss it for not being an episode of extended duration during his determination that Claimant did not meet the paragraph "B" criteria. (Tr. at 27). Additionally, he stated that he was assigning "partial weight" to the GAF scores, but did not elaborate further. (Tr. at 31).

In *Radford v. Colvin*, the Fourth Circuit stated that "[a] necessary predicate to

---

[6] (Tr. at 449, 454, 460, 465, 562, 566, 569, 574, 581, 588, 590, 592, 598, 602, 606, 610, 615, 620, 625, 680, 632, 638, 645, 657, 690, 691, 696, 707, 714, 723, 733, 744, 866, 892, 898, 935, 943, 948, 1112, 1116, 1122).

engaging in substantial evidence review is a record of the basis for the ALJ's ruling." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (citation omitted). "If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). "It is not the role of the courts to search for reasons for a decision that were not furnished by the ALJ." *Jackson v. Colvin*, No. 3:14cv24834, 2015 WL 5786802, at *2 (S.D.W. Va. Sept. 30, 2015); *See also Tanner v. Astrue*, C/A No. 2:10–1750–JFA, 2011 WL 4368547, at *4 (D.S.C. Sept. 19, 2011) (stating "if the ALJ did not rationally articulate grounds for her decision, this court is not authorized to plumb the record to determine reasons not furnished by the ALJ").

The Commissioner states that the ALJ had "overwhelming" evidence to support his decision, pointing to the numerous activities Claimant engaged, or was encouraged to engage in, that purportedly contradict her claims of disabling illness. (ECF No. 14, at 15-17). However, the ALJ never discussed why the evidence of Claimant's level of functionality showed that there was no danger that marginal *increases* in the level of demands on her would not result in decompensations like those she suffered in the past. As the ALJ never discussed Claimant's history of decompensation, or why even a minimal increase in mental demands or change in environment would not be expected to cause her condition to deteriorate, this Court can not engage in post-hoc reasoning and reach those conclusions on its own. *See Reynolds v. Berryhill*, No. 1:16CV29, 2017 WL 1128602, at *5 (N.D.W. Va. Mar. 24, 2017) ("The ALJ may have summarized and discussed the medical evidence and activities of daily living elsewhere in his decision but he failed to 'build an accurate and logical bridge from the evidence to his conclusion[s].") (quoting

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *See also Forquer v. Colvin*, No. 1:15cv57, 2016 WL 4250364, at *8 (N.D.W. Va. Aug. 11, 2016) (holding that an ALJ "failed to sufficiently explain how he derived his opinion" when he discounted all opinion evidence on the basis of the evidence of record and the claimant's activities of daily living); *Steel v. Barnhart*, 290 F.3d 936, 941 (7th Cir.2002) ("But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). Here, the ALJ never elaborated on his curt dismissal of Claimant's paragraph "C" claim, and never explained why his findings regarding her level of functioning elsewhere in the record might support his determination she did not meet the "C" criteria. This does not provide an adequate basis for review of the ALJ's decision.

Accordingly, the undersigned **FINDS** that the written decision does not reflect a clear and thorough analysis at step three of the disability determination process; specifically, as to the issue of whether Claimant's impairments met or equaled listing 12.04C(2). For that reason, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and must be reversed and remanded for consideration of Claimant's impairments under listing 12.04C(2).

### B. Opinion Evidence Evaluation

Claimant also argues that the ALJ erred in how he evaluated the opinion of licensed practical counselor, Florence Collier. She states that he inappropriately ignored the opinion of Ms. Collier solely because she was not a "medical source" as defined by the Social Security rules. (ECF No. 13 at 11). Claimant further contends that to the extent the ALJ dismissed Ms. Collier's opinion as contrary to the record, he was mistaken in doing

so. (*Id.*).

Opinions from professionally licensed counselors such as Ms. Collier, are considered "other source" opinions. SSR 06–03P, 2006 WL 2329939, at *2 (S.S.A. 2006*); see also* 20 C.F.R. §§ 404.1513(d), 416.913(d).[7] An ALJ must evaluate every medical opinion in the record, regardless of its source. *Id.* § 404.1527(d). Importantly, however, this mandatory evaluation requirement does not apply to opinions issued by professionals who do not fall within the definition of an "acceptable medical source," *see id.* § 404.1513(a) (defining "acceptable medical sources"), and whose opinion is therefore not a "medical opinion" within the meaning of the federal regulations. Pursuant to Section 404.1513(d), any opinion from "other sources" such as therapists or licensed counselors, even if medical in nature, "may" be considered. *Id.* § 404.1513(d). Thus, an ALJ is "permitted, but not required," to use such opinions. *Smith v. Comm'r of Soc. Sec.*, No. CIV. 4:09CV80, 2010 WL 1640271, at *3 (E.D. Va. Apr. 22, 2010). That is not to say however, that opinions from "other sources" such as Ms. Collier, are not valuable. Indeed, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,'" depending on the facts of the case. SSR 06-03P (S.S.A. Aug. 9, 2006).

Claimant is incorrect in stating that the ALJ dismissed Ms. Collier's opinion without any consideration simply because she was not a "medical source" under the rules.

---

[7] These regulations apply to claims, like Claimant's filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. For claims filed on or after March 27, 2017, a new regulatory framework for considering and articulating the value of medical opinions has been established. *See id.* § 404.1520c. *See also* 82 FR 5867, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective Mar. 27, 2017). *See also King v. Berryhill*, No. CV 6:17-338-RMG-KFM, 2018 WL 1629107, at *6 (D.S.C. Mar. 15, 2018), report and recommendation adopted, No. CV 6: 17-338-RMG, 2018 WL 1629134 (D.S.C. Apr. 3, 2018) (applying prior rules when initial claim filed before March 27, 2017).

He did state that he was rejecting her opinion "as Ms. Collier is not an acceptable medical source." (Tr. at 31). However, he went on to note that the record did not support her opinion, and summarized the conflicting evidence he had examined in detail earlier in the opinion. (*Id.*).

Claimant is correct in noting that Ms. Collier's opinion was supported by ample evidence in the record. However, this Court is not authorized to reverse the ALJ's decision when there is evidence in the record that supports a contrary position, indeed, it is not even authorized to reverse the decision if it believes the weight of evidence is against the ALJ's decision. The role of this Court is merely to determine if the ruling by the ALJ is supported by substantial evidence. *Blalock*, 483 F.2d at 775.

Here, as detailed above, the ALJ found substantial evidence which contradicted Ms. Collier's opinion that Claimant experienced "marked" difficulties in various functional areas. He noted that she was able to take weekend trips with her husband on his bus route, that she could travel, that she could care for others, that she could go for walks and visit the library, among other activities. (Tr. at 28-30). Additionally, the ALJ indicated that he was crediting the opinions of the State evaluators regarding Claimant's level of functioning and here, unlike with the paragraph "C" criteria, the evaluators explained the basis of their opinions. (Tr. at 26, 82, 97). As the ALJ explained the basis of his decision and supported it with evidence from the record, he did not commit reversible error in disregarding the opinion of Ms. Collier. *See e.g. Lilly v. Astrue*, No. CIV.A. 5:07CV77, 2008 WL 4371499, at *4 (N.D.W. Va. Sept. 22, 2008) ("However, the ALJ specifically found that the plaintiff was able to carry out daily activities—which include caring for her young children, performing household chores, shopping, and visiting family—and that such activities are 'inconsistent with total disability.'").

53

For these reasons, the undersigned **FINDS** that the ALJ did not err his assessment of Ms. Collier's opinion or the weight given to her opinion.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989);

*Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** September 21, 2018

Cheryl A. Eifert
United States Magistrate Judge